The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you. You can be seated. The first thing I want to tell you is welcome to the Fourth Circuit and relax. That's the key. I had a friend one time back home. He was trying a case. The jury was out, and I saw him. I said, how are things going? He said, I don't believe I've got much of a chance in this case.     I said, why is that? He said, you're in my closing argument. I'm willing to try. I said, why is that? The jury stuck their tongue out at me. That ain't gonna happen. Mr. Shapiro, I'm going to let you have an introduction. Good morning, Your Honors, and may it please the Court. My name is David Shapiro. I represent the appellant, Mr. Wilcox. And with the Court's permission, I'll introduce Charlie Hogle. Mr. Hogle is a law student at Northwestern Pritzker School of Law, and he is the Court's      I'm the Court's attorney. qualified under Local Rule 46A. Thank you very much, and we look forward to hearing from Mr. Hogle. Thank you, Your Honor. Thank you. All right, Mr. Hogle, whenever you're ready, we'll be glad to hear from you. Thank you, Your Honors. It's a privilege to be here. May it please the Court, Charlie Hogle for Plaintiff Appellant, Torey F. Wilcox.       Thank you. All right, Mr. Hogle, whenever you're ready, we'll be glad to hear from you. Mr. Wilcox is a Rastafarian who was prevented from attending congregate worship services. And when he filed a complaint in the district court, the district court dismissed his complaint at the screening stage on two apparent grounds, failure to state a claim and failure to exhaust administrative remedies. The record does not support either of those grounds. Mr. Wilcox did everything the law requires to exhaust his administrative remedies and to state a claim for relief under the Free Exercise Clause of the First Amendment. In his pro se complaint to the district court, Mr. Wilcox stated that the suspension of Rastafarian worship services for several months at Merion Correctional Institution resulted in, quote, deprivement of a reasonable opportunity to worship according to his Rastafarian tenets, beliefs, customs, and practices. That's at Joint Appendix, page four. He also explained that the suspension caused a, quote, defacement of his faith, which is at Joint Appendix, page eight. And he attached to his complaint an affidavit, which pointed out that weekly worship services are important to Rastafari because it is, quote, clearly stated in Rastafarian doctrine that all Rastafarians are to observe the Holy Sabbath, which is the Saturday of every week. And that's at Joint Appendix, page six. Finally, Mr. Wilcox submitted a document containing Sabbath guidelines, which are based on the Nyabingi Ceremony, a ceremony that derives from the oldest Sabbath ritual. And that is the Rastafarian sect of Rastafari. The document describes a Saturday congregation in which adherents come together to pray, sing, and read the Bible. That's at Joint Appendix, page 21. Thus, the complaint gives every indication that weekly worship on the Rastafari Sabbath is a vital part of Mr. Wilcox's religious exercise. In the past, this court has held that preventing prisoners from participating in communal religious services substantially burdens their First Amendment right to freedom. But that's not the case with this court's religious exercise. In Jehovah v. Clark, decided in 2015, this court recognized the substantial burden on religious exercise under the First Amendment when the only work assignments realistically available to a prisoner conflicted with the prisoner's Sabbath schedule, making it impossible for the prisoner to both participate in a work program and observe the Sabbath. In Lovelace v. Lee, an off-cited decision of this court, the court recognized the substantial burden on religious exercise when a disciplinary infraction prevented a Muslim prisoner from participating in the holy feast of Ramadan. The court also stated, in Lovelace v. Lee, that the Supreme Court's decision in a lone — This is not what you think the substantial burden is here. Are you going to have the weekly meeting? Your Honor, the — yes, the — He could pray all he wanted, right? He could pray alone in his cell, Your Honor. Pardon? Alone in his cell, he could pray, as far as we know. He could pray all he wanted to, personally. Right, by himself. Right. But he was deprived of the weekly meetings on Saturdays. Yes, Your Honor, the Sabbath celebrations. And the — Does the record show that the state claims, or the defendants claim, that they didn't have anybody to run the meetings? They didn't have a chaplain. Your Honor, what the record — Is that fairly in the record, that they didn't have somebody like a minister or chaplain? What do you call it in Rastafari? Well, the Rastafari term is something along the lines of minister. I'm not sure, but what was really needed for the prison was a — They didn't have anybody qualified. Exactly, to run the service who was not — You said several months. We're talking about, what, three months? Approximately four months, I think, Your Honor, from September 12th to around mid-January. I thought in December they said they had somebody. Oh, yes, Your Honor. So for the first three months, approximately, the prison's explanation for why Rastafari services had to be closed was that there was no minister available to oversee the services.  However, a chaplain newly hired by the prison was available to oversee the services. So when, in late November, the chaplain became available? Became available. So it was two and a half months or two months? Well, after the chaplain became available, the prison continued to suspend the services. Well, after the chaplain became available, I thought you said they had some excuse that the chaplain wasn't going to do it. But there was no chaplain for a couple of months. Right. At first, there was no chaplain. And then, once the chaplain was available, there was... But when did they file the complaint? Shortly after the services were closed, Your Honor. Did... I'm not quite sure I understand your argument with respect to reversing the dismissal of the complaint. As to Captain Menenik? Is that how you pronounce it? I pronounce it Menenik. Yes, Your Honor. It does... It was not clear to me from the record that he had anything to do with respect to the decision to terminate or not resume services. Your Honor, it's certainly not clear from the record exactly what input Chaplain Menenik had, but... The determination, I believe, was made by Wilcox, was it not? I'm sorry, Your Honor? I'm sorry. The determination was made... I'm sorry. With respect to... With respect... The decision was made by Terrell. Was it not? The decision not to resume services. According to the record, an executive decision came down from assisting superintendent from programs. Yes, Dwayne Terrell was one of the... Who's that? One of the defense in this case is the assistant... Who's that assistant superintendent? Dwayne Terrell. So that's who you're after? Well, Your Honor, we don't... You don't have a claim against that chaplain. He didn't do anything. Well, Your Honor, we think that the district court prematurely dismissed the chaplain because there's not enough information on the record to determine what part he played here, and the district court... But you've got to state a claim. Well, the claim... I mean, liberally construed, you have to state a claim. I don't know what he did. You've got somebody who made a decision in there, and you don't want... You don't want an injunction. Yes, Your Honor, right. Correct? Correct. And you don't want punitive damages. Correct? We're not prepared to concede exactly that. Well, I thought that was right. All right. And you don't want nominal damages. You want compensatory damage. Well, Your Honor, the complaint leaves open the possibility of compensatory, nominal, and punitive damages to be determined at some future point. So you... All right. So... The record... My understanding of the record was that you wanted real damages and didn't have a claim for nominal and punitive. Your Honor... And you didn't want an injunction. It's a 1983 case. Absolutely, Your Honor. You know that. It's a 1983 case. And what you get in 1983 cases, primarily, you're after damages from the individuals claiming they violated a clearly established constitutional right. Yes, Your Honor. And... Okay. So... You do want nominal damages. And you do want punitive damages. Yes, Your Honor. We want the damages determination. Uh... Mr. Wilcox, on joint appendix page 5, left it up to the court to determine the type and extent of damages that the court found would be warranted in this case. So right now, we're not closing off the possibility of punitive or nominal damages right now. You indicated... I believe it's your position that Mennick took actions that contributed to a constitutional violation. Is that correct? Yes, Your Honor. The complaint supports a reasonable inference. What actions? Your Honor, while Chaplain Mennick initially was prepared to provide Rastafari religious services, he then reneged on... Well, there doesn't appear... There's no explanation even proffered or suggested that it would have any... that it was a decision on his part. As opposed to a result of Mr. Terrell's decision that they would not be offered. There's nothing affirmative. Your formulation suggests that he took affirmative action in that regard. There doesn't appear to be that I saw anything in the record of an affirmative action in that respect. Uh... Your Honor, our key focus when it comes to Chaplain Mennick is that what the district court found was the basis for dismissing him was that Chaplain Mennick cannot be held responsible for following orders. But we don't... We're not limited to that as a grounds for affirmance. We can affirm... Of course, Your Honor. So my question, again, is what are you saying are the... what's your predicate for a suggestion that the chaplain took affirmative action and contributed to a constitution violation? Your Honor, uh... Chaplain Mennick was a professional involved in making decisions potentially at the prison and right now... You asked about affirmative... you alleged affirmative actions that contributed to a constitution violation. Right now, Your Honor, the record supports an inference that he was involved in the decision-making process and at this time... You understand that's not my question. You're saying that it's not necessary. For... We do think that it's necessary for some form of affirmative action to be taken. We just don't know that the record at the screening stage uh... is sufficient for the court to determine that there was no affirmative action considering that the allegation was made in complaint. Before you run out of time, tell me what the basis is for liability against Mr. Brown, Chaplain Brown. Uh... Chaplain Betty Brown is the director of... the head of the office of Religious or Chaplaincy Services and  Mr. Wilcox stated in his complaint that Chaplain Brown authorized Superintendent Dwayne Terrell and Assistant Superintendent of Programs... He personally did it or the office did it? Uh... that... that... the complaint alleges that Chaplain Brown authorized Assistant Superintendent Teague uh... to... to close Rastafari Religious Services. Uh... In your honors, uh... in terms of whether or not a substantial burden in this case could have been anticipated or should have been understood by prison officials uh... to be the consequence of canceling uh... Rastafari Worship Services. This court uh... has stated that communal worship in parenthesis group services and prayers uh... is among routinely allowed religious exercises and quote expecting prison officials to recognize that the denial of routinely allowed religious exercises is a burden should not exceed their knowledge or understanding of religious practices. That's in uh... Lovelace v. Lee at 189. Uh... The suspension of Rastafari Worship Services was on its face a substantial burden. Is that your best case? The Lovelace case? Uh... That's one of... Right here? That's the one that you rely on primarily? We rely heavily on Lovelace v. Lee as well as a number of other decisions published in this circuit um... which have found substantial burdens placed on prisoners who were prevented from attending communal worship services, uh... for instance in Miles v. Moore this uh... this court recognized a substantial burden on religious exercise when a prison's disciplinary policy prevented the plaintiff from attending Christian worship services and the prisoner stated in an affidavit his belief that quote church attendance is vital for Christian growth and development. Uh... In Parks L. V. Fleming this circuit recognized a substantial burden on religious exercise when a Muslim prisoner was temporarily banned from attending chapel and thereby prevented from observing a holy prayer service. They could do it if they had a reason like safety or something. Uh... Yes, your honor. They could make a decision like that, right? I mean prison officials run the prisons. We don't. Of course, your honor, yes. They got a penological interest uh... they can do some things, right? Uh... Yes, your honor. The Supreme Court's test from Turner uh... certainly lays out factors that once a substantial burden or a violation of a free exercise right is established um... there are there's a balancing test that the court can conduct to determine whether or not the offending regulation can be permitted to stand and the uh... there's the district court didn't uh... conduct a Turner test and possibly because there's really just not enough on the record for us to determine or to factor in all of those fact-heavy questions that the Turner test asks. Uh... Additionally, uh... here, the prison hasn't established a legitimate penological interest uh... based on the record itself. Certainly, the prison's attorneys have suggested that there was an absence of uh... available uh...  to oversee uh... weekly religious services, but there's no evidence that the absence or the evidence in the record I'm sorry, your honor, I see my time is up. You can finish your answer. Of course. Thank you, your honor. Um... Because the fact that prison services remain suspended after a chaplain was available suggests that the absence of somebody to oversee the services can't really explain the suspension, at least not for the entire time they were suspended. And with that, your honor, I'd like to turn it over to Ryan. Thank you, your honor. May it please the court. My name is Ryan Park, and I'm from the North Carolina Department of Justice, and we represent, along with my colleague, Kimberly Grandy, we represent the state defendants in this case. So, appellant Torrey Wilcox seeks $75,000 from four individual prison officials, including a prison chaplain, directly under the free exercise clause. They're claiming nominal damages and punitive damages, too. Do you understand that? No, your honor. As to punitive, that's very easy to address. So, punitive damages requires willful or wanton conduct. So, the claim is that they negligently closed the prison. That's on J4. He explicitly says it's a negligence claim, and there's no willful or wanton conduct. The complaint also specifically states that after a second chaplain was hired, Rastafarian services resumed. But not initially, as was promised.  penological interest was served by Terrell's executive decision to not, to renege on his promise to resume services once the new chaplain was hired? Yes, your honor. So, as a threshold matter, so there are two penological interests that are evident in the record. The first is, as the Smith v. Cotter case from the third circuit sets out, managing scarce financial resources is not responsive, okay? Stay with me. The chaplain, I mean, Terrell said that once the chaplain is hired, we will resume services, correct? That is the legend of the complaint, yes. But a chaplain is hired and he makes the executive decision not to do so for some period of time. Yes, for about a month. So, what was the reason for that? And it's not to be found in other cases. So, this is, so, oh, sorry, go ahead. So, what is the reason that we need from what we have before us to understand his determination not to do what he had said he would do? So, uh, managing, uh, No, well, why, but he would have known that when he said he was going to resume services once the chaplain, a chaplain was hired. Until a chaplain was hired, there was no one to supervise. They had to have someone manage the services. That's correct. When a chaplain was hired, they had someone to manage the services. So, what then was the reason for the executive decision not to do so? So, that is not true. And that's in the Jehovah case. But he doesn't know, he doesn't know why Carol reneged on his promise? That's correct. He does not have that information. Well, he can't be presumed to know that. Only, only Carol can know why he didn't follow through. I acknowledge, I acknowledge that, uh, the actual evidence of why services did not resume for four weeks is not in the record. But more broadly, this is a period... And that would be a period from late November to middle of January? So, that's a period, um, yes, correct, Your Honor, after the hiring of the first chaplain, Chaplain Wilcox, on January 14th, uh, the following. And when was Menick hired? Uh, he was hired on November 20th, actually. November 20th? Yes. To January the 14th? That's correct. There's no explanation in the record for why he wouldn't let this fellow go to his weekly meetings? That's correct, Your Honor. And there's no      to his weekly meetings? That's correct, Your Honor. Uh, as far as Wilcox knew when he filed the complaint, uh, the pause could have been indefinite. Um, but I'd like to talk very briefly about the actual substantial burden. January the 14th, how did that get in the record? Uh, that was in, uh, a declaration filed by another inmate that was, um, that was later. Is that properly in the record? I mean, it's not in the complaint. It's not in the complaint, Your Honor. The complaint was filed before that. Yes, Your Honor. Yes, Your Honor. Um, so, as to the main substantial burden question, so, uh, the plaintiff wants, uh, this court to hold as a reasonable opportunity to worship according to my religious beliefs. You don't think I would be, that would be sufficient to state a claim? It would be sufficient to state a claim if there were. But that's what he said, and that, and it's, it's pro se, and it's remarkably comprehensive, the deep pro se. He does a pretty good job of explaining why his worship services are essential to his Rastafari faith. Well, he's, what he states in the complaint is that he was deprived of a reasonable opportunity to worship according to his beliefs. Uh, but that could, of course, be true of an incidental burden on a peripheral practice. But he, but that's not, I think he goes on, he asserts that all Rastafarians are to observe the Holy Sabbath, which is the Saturday of every week,  why is that not sufficient under a liberal plea of statehood? The, the, what the complaint lacks, including in the, the reference to the Sunday  week, are, are a component of. Rastafarians are to observe the Holy Sabbath, I don't understand, this, you don't impose a higher treating burden on a pro se plaintiff, and that's what you seem to be arguing. So, this, this, there are many cases involving pro se plaintiffs, many of which. He said he was deprived of a reasonable opportunity to worship according to his, the Rastafarian tenant's beliefs, customs, and practices. So there are many cases, all of which Mr. Wilcox relies on, involving pro se complaints, that set out in far more detail and far more particularity the, the, the religious practice that has been alleged to have been restrained, including involving group services. So in the Lovelace case, for example. You say that if you took out Rastafarian and put Christian in there, that wouldn't be enough? So, it would be enough if, if, a reasonable opportunity to worship according to my  tenants, beliefs, customs, and practices. You would say that's not enough? It would be enough if it was accompanied by an allegation that group services. Yes, Your Honor. If you substituted Catholic, that wouldn't work either? So, to, to make the, the point, from point A to point B, and that is our central objection to the pleading. What were you not put on notice of? He's complaining that he can't worship, and that's the point of the pleading standard, so that the respondent can formulate a response. What did, what did the prison officials not know here on the basis of the complaint? So they knew, of course, that he was requesting weekly group Rastafarian services, but the, the, the gap from that request, and to a substantial burden on his exercise of religion, is what Your Honor suggested, is your own understanding of what other religions, with which other people are familiar with, require. But there are many religions that do not have as a common feature, weekly group services. So what specifically would you have had to say? He would have had to say, as the pro se prisoner said in Lovelace, there are three general categories, Your Honor. So one are details of the actual practice, and the second would be some sort of understanding of its place within the religion, and third, so as in Lovelace, for example, he cited that it was, that the Ramadan services were one of the five pillars of Islam, but in Krieger, for example, this court denied a free exercise claim based on the bare assertion that outdoor group worship sessions were required. It said that you have to allege more to explain how this is a central component of your religion, and I think what that gap illustrates, Your Honor, is that there is, it's not proper for this court to impose its own assumptions as to what religions do and do not require. There are, excuse me. I think I would suggest that's what the respondents do. I don't know what the response was to the question that he alleges that he is denied the opportunity to worship according to the tenets of his faith. And I don't know, I didn't know at this stage what more specificity you would require of him under a liberal community standard, but then you have said that before. So I think, Your Honor, yes, I mean, there are a wide variety of ways that pro se prisoners have achieved this pleading obligation. It's not a high hurdle to say, for example, that as a practice Rastafarian in the past, I have engaged in weekly group services for X amount of people. Didn't anybody know that it was weekly services? Well, so, again, I don't want, nothing is in the record as to... Well, page JA6. Yes, Your Honor. It says it is clearly stated in Rastafarian doctrine that all Rastafarians are to observe the Holy Sabbath, which is the Saturday of every week. Is that... Can you rely on that? Are we relying on that? It's in the appendix here. Yes, Your Honor. So, I think that... That shows it's the Holy Sabbath is the Saturday of every week. And four lines above they talk about the fact they couldn't engage in... You wouldn't allow weekly services. Weekly services. Right. And you talked about this liberal pleading and pro se complaint. Yeah. What do we do with that? Disregard it? Would you move to strike? It's written at the top of that page. It says witness affidavit. Yes. It's in this record. Yes, Your Honor. So, I think the inferential leap from... This is a practice that I have been deprived of participating in. And this is a substantial burden. And I think this is  central aspect of my religion. No, it's essential. It's the opportunity to worship according to the tenets of his faith, the tenets, beliefs, customs, and practices of his faith. So, there are a wide variety of cases, including Krieger. I point the court to the Leviton decision from the D.C. Circuit by Judge Garland, where he discussed a group of evangelical Christians who believed in the gospel, that it was something that emanated directly from requirements of their faith. And the court observed that there is a gap there between this is the practice I would like to                       with you. Returning to the question of whether or not attending religious services on the Sabbath is central to Mr. Wilcox's religious exercise. The Supreme Court has repeatedly and in many different contexts stated that it is beyond the competence of the courts to     particular religious belief or practice. The task of determining the centrality of a particular religious practice is to determine the  difference between   and religious practice. The Supreme Court in 2007 states that injury to a protected First Amendment interest can itself constitute compensable injury wholly apart from any emotional tort law. It can be discussed at length in an appellant's reply  pages 11-20. The tort law distinguishes between mental and emotional injuries. The Second, Sixth, Seventh, and Ninth Circuits have the same distinction between an injury to liberty under the First Amendment and a mere mental or emotional injury under traditional tort law and under the Prison Litigation Reform Act 1995. Finally, as the Court has indicated, the Second Circuit has the same distinction  mental or emotional injuries under the First Amendment and under the Prison Litigation Reform Act 1995. The Court           First Amendment and under the Prison Litigation Reform Act 1995. The Court has the same distinction mental or emotional
judges: William B. Traxler Jr., Robert B. King, Allyson K. Duncan